UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHEROLYN MCINTYRE,       )    Case No.:     1:04 CV 1857
                             )
      Plaintiff           )    JUDGE SOLOMON OLIVER, JR.
                             )
      v.              )
                             )
ADVANCE AUTO PARTS,      )
                             )
      Defendant        )    <u>ORDER</u>

On September 13, 2004, Defendant Advance Auto Parts (hereinafter, "Defendant" or "Advance") removed this action from the Richland County Court of Common Pleas. (ECF No. 1.) On June 6, 2005, Plaintiff Cherolyn McIntyre (hereinafter, "McIntyre" or "Plaintiff") filed her First Amended Complaint, alleging six causes of action: (1) Interference in Violation of the Family and Medical Leave Act (FMLA); (2) Sex Discrimination Hostile Environment in Violation of R.C. Chapter 4112; (3) Sex Discrimination Quid Pro Quo in violation of R.C. Chapter 4112; (4) Retaliation in Violation of R.C. Chapter 4112; (5) Retaliation in Violation of Ohio Public Policy; and (6) Negligent Supervision/Negligent Retention. (First Am. Compl., ECF No. 36.)

Now pending before the court is Plaintiff's Motion for Partial Summary Judgment on Liability for Discrimination and Family Medical Leave Act Claims (ECF No. 76) and Defendant's Motion for Summary Judgment on all of Plaintiff's claims (ECF No. 87). For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is denied and Defendant's Motion for

Summary Judgment on all of Plaintiff's claims is granted in part and denied in part.

## I. BACKGROUND

### A. Sexual Harassment

Advance owns and operates several stores, including a store located on Ashland Road in Mansfield, Ohio and a store located in Marion, Ohio.  (*See* Declaration of Regional Human Resources Manager Paul Fruehan ("Fruehan Decl.") ¶ 6, ECF No. 88, Ex. A-1.)  Plaintiff was first employed by Advance at their parts distribution warehouse in Delaware, Ohio, from July of 2001, through October 2001. (*See* Affidavit of Cherolyn Chambers[1] (hereinafter referred to as "McIntyre-Chambers Aff.") ¶¶ 2, 3, ECF No. 76-2.)  In October of 2001, she started working as a Parts Detailer at the Advance store on Ashland Road in Mansfield Ohio, Ohio. (*Id.* ¶ 3.)  Plaintiff was an hourly employee.  At this time, Plaintiff was going through a custody battle with the father of Plaintiff's young daughter and felt that she needed to demonstrate a stable employment situation.  (McIntyre Chambers Dep. 215-216, ECF No. 72-1.)  As a result, Plaintiff kept a journal during this time.

Shortly after Plaintiff began at the Ashland Road Store, David Moyer ("Moyer") became the General Manager.  (*Id.* ¶ 4.)  The decision to transfer Moyer to the Ashland Road Store was made in part by District Manager Christopher Clegg (" Clegg").  (*See* Clegg Dep. at 10-11, ECF No 83.)  In 2002, Clegg spent about ninety-five percent of his time visiting the stores under his supervision, and he had been regularly to the Ashland Road Store. (Clegg Dep. 30-32.)  He knew all the employees there by name, including Plaintiff, and asked them whether they had any concerns or

---

[1]     After June 13, 2005, Plaintiff Cherolyn McIntyre became known as Cherolyn Chambers. Plaintiff shall be referred to as McIntyre throughout this order, and the court shall refer to the "Affidavit of Cherolyn Chambers" as the McIntyre-Chambers Affidavit for ease and clarity.

issues about their management team. (Clegg Dep. 33.) Clegg was known by store employees throughout his Division as professional, serious, and intolerant of bad language, horseplay, or any other inappropriate conduct. (Shaffer Dep. 102.) When Moyer introduced himself to Clegg at a store manager meeting, Moyer stated something along the lines that he was a "womanizer." (Clegg Dep. 29.) Clegg responded by pulling Moyer aside after the meeting and reprimanding him. Clegg told Moyer to "refrain from cutting up in my meetings . . . we're very professional here." (*Id.*)

According to Plaintiff, within a week of Moyer's arrival at the store, Moyer told McIntyre that if she did not start joking around and having a "good time," "you're not going to work here anymore." (McIntyre-Chambers Dep. 143-144, ECF No. 72.) Plaintiff also states that Moyer would ask her why she did not love him, and told her that because his girlfriend Carla was gone it was McIntyre's job to "take care of business." (McIntyre's Notes, 1, 6, Ex. XX, ECF No. 88.) McIntyre states that Moyer told her he would take hours away from her and that he did take hours away from her. (*See* McIntyre Dep. 166-167, 215-216.) Plaintiff also states that Moyer's inappropriate behavior included pulling her shorts down and pulling her onto his lap, grabbing her and wrestling her to the floor, grabbing her breasts, and reaching up her shorts when she was on a ladder. (*See* McIntyre-Chambers Dep.153-155.)

The deposition testimony of Assistant Manager in Training Melissa Luna[2] ("Luna") corroborates Plaintiff's account. Luna stated that when McIntyre was on a step-ladder, Moyer would, "poke her butt, poke her crotch" and that she also saw him throw pieces of paper into McIntyre's and two other female employees' shirts and then "go for it" (retrieve the piece of paper out of her shirt). (Luna Dep. 37, ECF No. 71.) Luna stated that she saw Moyer come up behind

---

[2]    Luna was formerly known as Davis.

women and poke their buttocks, poke them in the groin area and grab their love handle area.  (*Id.*)

Luna declared that there was never a time when McIntyre appeared to enjoy being touched by

Moyer and that she never saw McIntyre initiate any of the touching encounters with Moyer.  (*Id.* at

112.)  At one point in time, Luna told Moyer to "leave [McIntyre] alone, she's doing her job."  (*Id.*

at 112-113.)  Luna also stated that Moyer would frequently say , "look, my bitches are on their

knees," whenever a woman was "doing anything knelt down"  (*Id.*  at 35) and that she frequently

heard Moyer refer to McIntyre as a "stupid bitch."  (*Id.* at 36.)

McIntyre stated at her deposition that Moyer would follow her through the store, threatening

her and grabbing her.  As a result she was unable to do her job.  (McIntyre-Chambers Dep. 154.)

McIntyre maintained that Moyer at times physically prevented McIntyre from doing her job by

grabbing her and wrestling her to the ground while she was working.  (*Id.*)  Assistant Manager

Nicole Zobrist ("Zobrist") stated at her deposition that McIntyre did a "great job" when she was not

around Moyer, but that when Moyer was around she was uncomfortable and there was tension.

(Zobrist Dep. 69, ECF No. 74.)

## B. Advance's Anti-Sexual Harassment Policy

Advance had a written sexual harassment policy in its employee handbook (the "Employee

Handbook").  (*See* Advance AutoParts Employee Handbook, 2-3, 15-16,  Ex. B, ECF No. 88.)  The

Employee Handbook contains a section regarding Advance's sexual harassment policy and states:

"Advance Auto Parts considers sexual harassment in the workplace unacceptable conduct, which

will not be tolerated." (*Id.* at 15, 16.)  The Employee Handbook instructs employees "How to Report

Harassment" and states,

> [a]ny employee who feels he/she or someone with whom he/she
> works has been subjected to sexual harassment should promptly

-4-

> report the conduct to his/her immediate supervisor.  Such matters
> cannot be resolved unless they are promptly and truthfully reported.
> If an employee is not comfortable reporting an incident to his/her
> immediate supervisor, a complaint may be filed with the next level(s)
> of management, or the Human Resources Department.  Complaints
> may also be reported on the Employee Hotline. . . .

(*Id.* at 16.)

The Employee Handbook concludes with three paragraphs, detailing Advance's response upon receipt of a complaint and states that "Advance will take appropriate disciplinary action, up to and including termination, against any employee who discriminates against or harasses another employee." (*Id* at 16.)  Plaintiff signed a written acknowledgment that she had received, reviewed and understood Advance's Employee Handbook  (Ex. Z-1, ECF No. 88.)  Additionally, Plaintiff's on-line training records reflect that she had completed programs that included Advance's sexual harassment policy and procedures (Ex. EE, ECF No. 88).

Defendant also had an "Open Door "policy articulated in its Employee Handbook, which stated as follows:

> Any employee with a suggestion, problem, complaint, or who wishes to report
> misconduct or a violation of Company policy, should contact his/her immediate
> supervisor about the matter. If the employee does not feel comfortable discussing the
> matter with his/her immediate supervisor, or if the employee is not satisfied with
> how the immediate supervisor resolved the matter, the employee *should* contact the
> next level of management or the Human Resources Department.

(Employee Handbook, 3 Ex. B (emphasis added). )

### C. Plaintiff's Report of Sexual Harassment

In or around March of 2002, Assistant Manager Zobrist was transferred to the Ashland Road store in Mansfield.  (Zobrist Dep. 47.)  Regional Human Resources Manager Paul Fruehan ("Fruehan") stated at his deposition that Assistant Managers are immediate supervisors of hourly

employees.   (Fruehan Dep. 68.)   Shortly after Zobrist arrived, McIntyre told her about the

harassment.  (McIntyre-Chambers Dep.106-107;  Zobrist Dep. 49.)  McIntyre states that Assistant

Managers in Training Melissa Luna and Paul Dotson also knew about Moyer's harassing behavior.

(McIntyre-Chambers Dep. 105, 153, 222 and 242.)  McIntyre asked Zobrist "for help" and asked

her to "take care of it," and Zobrist said she would.  (*Id.* at 105.)  Zobrist, however, never reported

the sexual harassment to District Manager Clegg and instead, tried to "handle it inside."  (Zobrist

Dep. 143-144.)  Zobrist "wanted to try to handle [the situation] with [Moyer] instead of taking it

outside. . . [b]ecause [Moyer] was . . . very manipulative and [Zobrist] wanted [her] job."  (*Id.* at 50.)

Defendant concedes that "in March 2002, [Zobrist] had dissuaded Plaintiff from reporting Moyer

to the corporate office."  (*See* Def.'s Mot. for Summ J. 16, ECF No. 87-2.)

Around the end of June 2002, Plaintiff told Assistant Manager Zobrist that Moyer had pulled

down her pants while she was on a ladder.  (Zobrist Dep. 37, 49.)  McIntyre told Zobrist that she did

not know what to do and that she needed the job.  (*Id.* at 38.)  Zobrist told McIntyre that she "would

help her" and that McIntyre "wasn't going to go through it by herself."  (*Id.*)  Shortly thereafter,

Zobrist told Moyer that "this has got to stop." (Zobrist Dep. 39.)  Zobrist asked Moyer about pulling

down McIntyre's pants, and Moyer responded that it was just "fun and games."  (*Id.*)  Zobrist

continued to tell McIntyre that she was going to take care of it, from March of 2002, through

December of 2002.  (McIntyre-Chambers Dep. 111-112.)  At her deposition, Zobrist stated that she

saw Moyer rubbing McIntyre's shoulders, poking at her, playing with her hair and "just messing

with her out in the store."  (Zobrist Dep. 61.)

Zobrist also states that she saw Moyer pull McIntyre onto his lap in the office and that when

McIntyre tried to get up, Moyer pulled her back down again.  (*Id.* at 61-62.)  Zobrist stated that

-6-

McIntyre walked off "appearing agitated." (*Id.* at 62.) Zobrist also stated that when she visited McIntyre's home, Moyer would call McIntyre as many as five or seven times an hour. (*Id.* at 63-64.) At no point did McIntyre ever tell Zobrist that she liked or wanted Moyer's attentions and Zobrist stated at her deposition that McIntyre did not like Moyer's behavior towards her. (Zobrist Dep. 50, 38.) Plaintiff states that all of Moyer's behavior was unwelcome. (McIntyre-Chambers Aff. ¶ 5.) However, Plaintiff did go on outings with Moyer outside of work, alone and with her daughter.[3] (*See* Pl.'s Answers to Interrogatories No 10 (detailing an outing to Chuck E. Cheese, the Zoo, Jerry's Restaurant, and Magic Mountain).) Moreover, according to Moyer, McIntyre engaged in "consensual sexual relations" with him.[4] (Moyer Decl. ¶ 6, Ex. PPP, ECF No. 101.) Plaintiff denies that he never had a romantic or sexual relationship with Moyer. (McIntyre-Chambers Dep. 214.)

In early December of 2002, McIntyre left the Ashland Road Store and transferred to an Advance store in Marion, Ohio. However, McIntyre states that Moyer continued to call and threaten her. (McIntyre-Chambers Dep. 130- 131.) In late December of 2002, McIntyre told the Marion Store Manager Randy Shaffer ("Shaffer") that she "couldn't take it anymore." (McIntyre-Chambers Dep. 232.) Plaintiff believes that Shaffer then called District Manager Clegg. (*Id.*) McIntyre then spoke to Clegg. (*Id.* at 236.)) Plaintiff stated that Clegg responded to her sexual harassment complaint by saying he had been "waiting on [her] call." (McIntyre-Chambers Dep. 235-236.) Defendant argues that the reason Plaintiff did finally report Moyer's conduct to Marion Store

---

[3]     Plaintiff contends that she was given the choice of going out with Moyer or losing her job. (McIntyre-Chambers Dep. 228.)

[4]     *See* separate Order addressing Plaintiff's argument that Moyer's Declaration should be afforded no weight.

Manager Shaffer and District Manager Clegg was because Moyer had reprimanded Plaintiff's friend Sue Schiefer.[5]   (Employee Action Report Against Sue Schiefer Ex. HHH.)

### D. Advance's Investigation

Advance's investigation was conducted by Human Resources Manager Fruehan and District Manager Clegg on December 30, 2002, and January 2 and 3, 2003.          Advance maintains that during its investigation, Plaintiff identified Zobrist as the only person in a management position at the store on Ashland Road to whom Plaintiff had reported the sexual harassment.  (*See* Plaintiff's Written Statement dated December 30, 2002, Ex. XX, ECF No. 88.)   Plaintiff had not used any of the other reporting procedures outlined in the Employee Handbook, such as calling the anonymous employee hotline, or reporting Moyer's behavior to another supervisor, other than Zobrist.  (Plaintiff Dep. 223-224; *see also* Plaintiff's Written Statement dated December 30, 2002, Exh. XX.)  District Manager Clegg visited the store on Ashland Road in Mansfield many times, and he  never witnessed Moyer say or do anything to suggest that sexual harassment was a problem at the store. (Clegg Dep. 36.)  Moreover, Moyer's personnel file reflects no similar allegations against him, either before or during his time at Advance.  (*See* Excerpts from Moyer's Personnel File Ex. SS, ECF 88.)

During the investigation, Regional Human Resources Manager Fruehan and District Manager Clegg spoke to Moyer.  Fruehan stated at his deposition that Moyer "admitted to the use of obscene language," "picking up [] people and spinning them around," and "the pulling down of pants in the office."  (Fruehan Dep. 107.)  Fruehan and Clegg found that Moyer had engaged in prohibited misconduct and Advance fired Moyer on January 3, 2003.  (*See* Excerpts from Moyer's Personnel

---

[5]      Sue Schiefer married  Randy Shaffer in  September of  2004, thus becoming Sue Shaffer. Sue Shaffer shall be referred to by her maiden name of  Schiefer throughout this Order.

File, Ex. SS, ECF No. 88.)  Advance's investigation also determined that Plaintiff had complained about Moyer's misconduct to Zobrist and that Zobrist had failed to forward the complaint to Human Resources or to Moyer's immediate supervisor.  Zobrist was fired on January 4, 2003.  (*See* Zobrist Separation Notice, Ex. WW, ECF No. 88.)  According to Zobrist, when District Manager Clegg fired her, he told her,

> We have been watching you for a long time.  We wanted to see if you would make anything – any move– any kind of move.  We wanted to give you your time to shine. Meaning that we knew that there was some case or something going on with Dave [Moyer] and Cher [McIntyre] but we wanted you to come to us, you know, to give you that moment, quote, unquote, to shine.  We wanted it to be your time so we could promote you within the store. And then he fired me.

(Zobrist Dep. 55.)

### E. Plaintiff's FMLA Leave of Absence

Plaintiff requested a medical leave of absence from April 29, 2003,  to May 29, 2003, pursuant to the Family and Medical Leave Act ("FMLA").  (Fruehan Decl. ¶ 9.)  McIntyre claims she was suffering from daily headaches, nausea, trouble concentrating, trouble sleeping and blurred vision.  (McIntyre-Chambers Aff. ¶ 9.)  Advance's Medical Benefits Specialist Donna Gravely ("Gravely") gave Plaintiff some written materials explaining her rights and responsibilities, and some paperwork, including Employee Request for Family and Medical Leave of Absence form, to be completed by Plaintiff, and Certification of Health Care Provider form, to be completed by Plaintiff's doctor.  (*See* May 8, 2003 Memorandum, Ex. E-1, ECF No. 88; Advance's FMLA Procedures & Paperwork, Ex. E-2, ECF No. 88.)  Included in this paperwork was a letter to Plaintiff, entitled "Memorandum" that stated, "You will need to remain in contact with your immediate supervisor/manager regarding your progress or recovery."  (May 8, 2003 Memorandum, Ex. E-1.)

Plaintiff delivered a doctor's note to the Marion Store, excusing her from work from April 29

to May 4, written by Dr. Ceruzzi.  (*See* Note # 1, Ex. H, ECF No. 88.)  This note  indicated that

Plaintiff could return to work on May 5, 2003.  (*See id.*)  Plaintiff delivered a second doctor's note

to the Marion Store, also written by Dr. Ceruzzi, which excused her from work from May 5 to

May 11, 2003.  (*See* Note # 2, Ex. I, ECF No. 88.)  On Friday, May 9, 2003, before her FMLA leave

had been approved, Plaintiff went to the Marion Store to check the work schedule for the following

week beginning Monday, May 12.  When she saw that she was scheduled to work one close on a

Monday, she expressed her dissatisfaction with Store Manager Aaron Drake ("Drake").  (*See* Drake

Dep. 53-58, Ex. J, ECF No. 88; Clegg Dep. 80-85, ECF No. 83; Plaintiff Dep., 264-265 Ex. K, ECF

No. 88; Plaintiff's Journal Entries, 05/09/2003, Ex. L, ECF No. 88.)  Drake explained that he needed

her to stay late one evening because the store's inventory could not be managed properly if she, as

the inventory specialist, was not there when new merchandise came in off the trucks.  (*See* Drake

Dep. 53-58, Ex. J, ECF No. 88)  District Manager Clegg witnessed the exchange and confirmed to

Plaintiff that her position as inventory specialist required that she work until close on "truck night."

(Clegg Dep. 80-85, ECF No. 83.)

On Monday, May 12, Plaintiff did not return to work.  Instead, she provided a third note from

Dr. Ceruzzi, with a return to work date of Wednesday, May 14, 2003.  (Note. # 3, Ex. P, ECF

No.88.)

On May 13, 2003, Plaintiff faxed to Advance's Medical Benefits Department her completed

Employee Request, as well as the Certification which had been completed and signed by Plaintiff's

family practitioner, Dr. Ceruzzi.  (*See* FMLA Documents and Certification, Ex. F, ECF No. 88.)

On May 14, 2003, Advance approved Plaintiff's request for 30 days FMLA leave, from

April 29 to May 29, 2003.  (*See* Notice of Leave Request Disposition, Ex. G-2, ECF No. 88; Def.'s

Answer to First Amended Complaint ¶ 69, ECF No. 45.)  Fruehan's declaration states that "Advance approved Plaintiff's request for FMLA leave for that 30 day period of time, subject to independent written confirmation by Plaintiff's health care provider(s) verifying the medical necessity leave on the requested dates."  (Fruehan Decl. ¶ 10, ECF No. 88.)  However, the notice of Leave Request Disposition approving Plaintiff's request indicates no such condition.  (*See* Notice of Leave Request Disposition, Ex. G-2, ECF No. 88.)

On May 15, 2003, Drake, acting at the direction of Human Resources Manager Fruehan and/or District Manager Clegg, called Dr. Ceruzzi's office to confirm the accuracy of the May 14, 2003, return-to-work date on the last doctor note that Plaintiff had provided.  (Def.'s Answer to First Am. Comp. ¶ 70; Drake's Letter to McIntyre, Ex. Q, ECF No.88.)  Defendant maintains that "someone named Anita from Dr. Ceruzzi's office did confirm May 14, 2003 as Plaintiff's return-to-work date."  (*Id.*)

On May 17, 2003, at the instruction of Fruehan, Drake sent McIntyre a letter via certified mail.  (Drake Dep. at 43-44.) The undated letter stated as follows:

> Dear Cherylan,
>
> On 5-12-03 you provided us with a return to work notice from Dr. Ceruzzi that indicated you could return to work effective 5-14-03.  On 5-15-03 we spoke with Anita at the doctors [sic] office, and they confirmed that you were released to return to work effective 5-14-03. We have attempted to contact you two times via telephone and have left messages for you to contact me at the store.  As of this writing we have not had any contact with you.
>
> Please be advised that you must contact me at the store no later than 9pm Wednesday May 21, for your schedule on Thursday 5-22-03.  If you do not contact us by Wednesday, and report to work on Thursday, we will proceed with termination of your employment for failure to return from a Leave of Absence.
>
> Sincerely,
> Aaron Drake
> 740-386-2472
> Please give me a call if you have any questions.

-11-

(Drake's Letter to McIntyre (hereinafter referred to as "Drake's Letter"), Ex. Q, ECF No. 88.)

According to McIntyre, she did not receive Drake's Letter until some point after May 22, 2003. (McIntyre-Chambers Aff. ¶ 12.)  However, McIntyre called Advance's Medical Benefits Specialist Gravely in the home office on May 21, and said that she would see a doctor the following day and would fax to Gravely an updated doctor note placing her out of work until May 29.[6] (Drake Dep. 60, 87-88; Gravely's May 21, 2003 E-mail to Drake and Fruehan, Ex. R, ECF No. 88.) Medical Benefits Specialist Gravely sent an E-mail to Regional Human Resources Manager Fruehan that same day, May 21, 2003, conveying this information. (*Id.*) Advance maintains that as a result of the phone call to Gravely on May 21, 2003, it did not process Plaintiff's termination as referred to in Drake's Letter.  Despite receiving the e-mail from Gravely stating that McIntyre had contacted her on May 21, Fruehan did not direct Marion Store Manager Drake or District Manager Clegg to contact McIntyre and tell her that Drake's Letter was going to be withdrawn and that Advance was not going to proceed with her termination.  (Fruehan Dep. at 140.)  Fruehan stated that he did  not do so because "there was no need to make any changes because the family leave would have superseded the letter." (*Id.*)

According to McIntyre, at some point after May 22, 2003, she went to the post office to pick up the certified letter (Drake's Letter)  from Advance.  (McIntyre-Chambers Aff. ¶ 12.)  Because the date which Drake had written as the deadline for her to return to work or be terminated had passed, McIntyre states she believed that she had been terminated and thus applied for unemployment. (*Id.* ¶ 14.)  Marion Store Manager Drake stated that he recalled receiving a phone

---

[6]     Plaintiff did fax to Gravely a fourth doctor's note, from psychologist Dr. Jacqueline Rothman, which excused Plaintiff from work from May 14 through May 30, 2003. (*See* Dr. Rothman's Note, Ex. T, ECF No. 88.)

call about McIntyre's unemployment claim "a couple or three weeks before the actual termination time." (Drake Dep. at 76-77.)

When McIntyre's FMLA leave ended on Thursday, May 29, 2003, she did not report to work or call in for her work schedule. (Clegg Decl. ¶ 6, Ex. NNN, ECF No. 88.) Advance entered Plaintiff's return-to-work date as Saturday, June 7. (*Id.*) Plaintiff was scheduled to work Wednesday, Thursday and Friday, June 11, 12, and 13. Defendant maintains that Plaintiff was notified of her assigned schedule, but points to no evidence in the record supporting this assertion. Plaintiff did not report to work on those days and she failed to notify Advance that she would be absent those days, in violation of Advance's attendance and notification policies. (Drake Dep. 110.) Advance maintains that "[b]ecause of those violations, and because [McIntyre] failed to return to work upon expiration of her approved medical leave, Plaintiff's employment was terminated on [Friday] June 13, 2003." (Def.'s Mot. for Summ. J. 8-9; On Line Separation Form from Advance, Ex. W, ECF No. 88.)

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Fed. R. Civ. P. 56(c). Federal Rule of Civil Procedure 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit

> affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standard.  Thus, in most civil cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-*

*Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id*.

### III. LAW AND ANALYSIS

### A. Plaintiff's FMLA Claim

<u>1. Theories of Recovery Under the FMLA</u>

The FMLA permits employees to take up to twelve weeks of unpaid leave annually if they have a serious health condition.  29 U.S.C. § 2612(a)(1)(C).  FMLA leave may be taken in blocks of time (i.e., to recover from surgery) or intermittently (i.e., for a recurring health condition).  *Id.* at § 2612(b).  The FMLA provides that, upon expiration of the leave, the employee is entitled to be restored either to the position that she held when her leave began or to an equivalent position. 29 U.S.C. §2614(a)(1).

The Sixth Circuit has recognized two distinct theories of recovery under the FMLA.  *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004).  First, there is the "interference" or "entitlement" theory under 29 U.S.C. § 2615(a)(1), which reads, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  *See Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 335 (6th Cir. 2005) (citation omitted);  *Kitts v. Gen. Tel. North, Inc.*, 2005 U.S. Dist. LEXIS 20421 *25 (S.D. Ohio 2005).  Such employer behavior will subject it to civil liability under the act.  29 U.S.C. §

-15-

2617.  Congress has authorized the Department of Labor ("DOL") to issue implementing regulations for the FMLA.  29 U.S.C. § 2654.  These regulations are entitled to deference under *Chevron USA, Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984). Violation of any of the implementing regulations may also constitute unlawful interference.  *Kitts*, 2005 U.S. Dist. LEXIS 20421 *25 (citing 29 C.F.R. § 825.220(b)).

The second theory of recovery under the FMLA is a "retaliation" or "discrimination" claim arising under 29 U.S.C. § 2615(a)(2), which prohibits employers from discharging, or discriminating against, employees who oppose unlawful FMLA practices. *See id.* (citing *Hoge*, 384 F.3d at 244.)  In this case, Plaintiff seeks recovery under the interference theory.  Plaintiff and Defendant both move for summary judgment on Plaintiff's FMLA claim.

### 2. Establishing an FMLA Interference Claim

A plaintiff asserting an FMLA "interference" claim must establish the following by a preponderance of the evidence:

> (1) she is an eligible employee, as defined in 29 U.S.C. § 2611(2);
> (2) Defendant is a covered employer, as defined in 29 U.S.C. § 2611(4);
> (3) she was entitled to take leave under the FMLA, [29 U.S.C. § 2612(a)(1)];
> (4) she gave adequate notice of her intention to take leave, [29 U.S.C. § 2612(e)(1)]; and
> (5) Defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights.

*Kitt*, 2005 U.S. Dist. LEXIS 20421 *25-26 (citations omitted); *see also, Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).  The only element in dispute in the instant case is whether Advance denied McIntyre FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights.

3. Alleged Violation of the FMLA Regulations

Defendant argues that Plaintiff's claim for FMLA interference cannot be sustained because Advance approved McIntyre's FMLA leave for the full amount of time she requested.  (Def.'s Mot. for Summ. J. 22.)  The fact that Advance granted McIntyre's requested FMLA leave is not dispositive.  Under 29 C.F.R. § 825.220(b),  "[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act."  Plaintiff argues that Advance interfered with her FMLA rights by directly contacting her physician in violation of 29 C.F.R. § 825.307(a), rather than contacting Plaintiff.  Thus, she was not allowed a reasonable opportunity to cure any deficiency regarding her medical certification for FMLA leave as mandated by 29 C.F.R. § 825.305(d).

Section  825.305 (d) states,

> § 825.305 When must an employee provide medical certification to support FMLA leave?
>
> ***
>
> (d) At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification. *The employer shall advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any such deficiency.*

29 C.F.R. § 825.305(d) (emphasis added).  The record is clear that on May 14, 2003, Advance approved Plaintiff's request for 30 days FMLA leave, from April 29 to May 29, 2003.  (Notice of Leave Request Disposition, Ex. G-2.) Advance maintains that the leave was approved "subject to independent written confirmation by [Plaintiff's] health care provider verifying the medical necessity of Plaintiff's leave on those dates." (Def.'s Mot. for Summ. J. 5;  Fruehan Decl. ¶ 10;

-17-

Fruehan Dep. 142-143; ECF No. 88; Def.'s Answer to First Am. Compl. ¶ 69, ECF No. 45.)  The record is also clear that on May 15, 2003, Drake, at the instruction of Human Resources Manager Fruehan and/or District Manager Clegg, directly called Plaintiff's doctor to confirm the accuracy of the return-to-work date listed on the third note from that doctor as May 14, 2003. (Def.'s Answer to First Am. Comp. ¶ 70.)

However, it is unclear from the record whether Defendant found Plaintiff's medical certification to be "incomplete" so as to trigger its duty under 29 C.F.R. § 825.305(d).  *See Sorrell v. Rinker Materials Corp*., 395 F.3d 332, 338 (6th Cir. 2005) (finding that it was "unclear from the record whether [the employer] found [the doctor's] medical certification 'incomplete' so as to trigger [the employer's] duty under 29 C.F.R. § 825.305(d)."); *Shtab v. Greate Bay Hotel & Casino, Inc.*, 173 F. Supp. 2d 255, 266 (D.N.J. 2001) (denying summary judgment when "genuine issues of material fact exist[ed] as to whether [the plaintiff's] medical certification was 'incomplete' so as to require the [employer] to give him an opportunity to correct it.").

There is evidence in the record supporting the conclusion that Defendant found Plaintiff's medical certification to be incomplete, thus triggering Advance's duty under 29 C.F.R. § 825.305(d).  For example, Advance maintains that the doctor's certification provided by Plaintiff "did not specify the dates that Plaintiff needed leave, but Advance approved her request . . . subject to independent written confirmation by her health care provider verifying the medical necessity of Plaintiff's leave on those dates." (Def.'s Mot. for Summ. J. 5;  Fruehan Decl. ¶ 10; Fruehan Dep. 142-143; Certification of Health Care Provider, Ex. F, ECF No. 88.) This indicates that Advance found Plaintiff's medical certification to be incomplete, in which case Defendant's duty under 29 C.F.R. § 825.305(d) would have been triggered.

-18-

There is also evidence in the record that Defendant did *not* find Plaintiff's medical certification to be incomplete, in which case Defendant's duty under 29 C.F.R. § 825.305(d) would *not* have been triggered.  For example, the Notice of Leave Request Disposition approving Plaintiff's request does not indicate that Plaintiff's FMLA leave was approved subject to any contingency, such as written confirmation by Plaintiff's health care provider verifying the medical necessity of Plaintiff's leave on those dates.  (*See* Notice of Leave Request Disposition, Ex. G-2, ECF No. 88.)  Additionally, Plaintiff argues oddly that "[t]here is no evidence that Advance found McIntyre's certification to be incomplete-only that they believe there was a conflict between the certification and a previous doctor's note."  (Pl.'s Mot. for partial Summ. J. 30; Fruehan Dep. 119.)  As there is a genuine issue of material fact in dispute, summary judgment is inappropriate.  Accordingly, the portion of Plaintiff's Motion for Summary Judgment alleging violation of 29 C.F.R. § 825.305(d) must be denied.

Plaintiff also argues that Defendant violated 29 C.F.R. § 825.307(a), which provides as follows:

> § 825.307 What can an employer do if it questions the adequacy of a medical certification?
>
> (a) If an employee submits a complete certification signed by the health care provider, the employer may not request additional information from the employee's health care provider. However, a health care provider representing the employer may contact the employee's health care provider, with the employee's permission, for purposes of clarification and authenticity of the medical certification.

29 C.F.R. § 825.307.  For the same reasons that the record is unclear as to whether Defendant found Plaintiff's medical certification to be incomplete, the record is likewise unclear as to whether Advance "question[ed] the adequacy of [Plaintiff's] medical certification."  *Id.*  Accordingly, the

-19-

portion of Plaintiff's Motion for Summary Judgment alleging violation of 29 C.F.R. § 825.307(a) must also be denied.

### 4. "Technical" Violations of the FMLA Regulations

In support of its argument that Plaintiff cannot establish a *prima facie* case of interference, Defendant cites two cases where technical violations of the FMLA regulations were excused by the courts when the employer had afforded the employee all the FMLA benefits to which the employee was entitled. Defendant maintains that it provided Plaintiff all of the FMLA leave that she requested, thus any technical violation of the FMLA regulations should be excused.

The first case cited by Defendant is *Covucci v. Service Merchandise Co.*, 1999 U.S. App. LEXIS 2073 (6th Cir. 1999). In *Covucci*, the plaintiff argued that the defendant had violated the FMLA because "under the regulations issued pursuant to the FMLA an employer cannot count a leave of absence as an FMLA leave without officially designating the leave as such." *Id.* at *12. The court found that the employer failed to designate any portion of plaintiff's twelve-month leave as FMLA leave as it was required to do under 29 C.F.R. § 825.208(a)(2) & (b), and thus "technically" violated the FMLA regulations. *Id.* at *14. However, the Sixth Circuit excused the technical violation, concluding that because the plaintiff was given twelve months of unpaid leave, he was not denied any of the substantive rights promised by the FMLA. *Id.* at *15. The court stated, "it would be an egregious elevation of form over substance to allow [the plaintiff] an additional twelve weeks of leave specifically coded as FMLA leave." *Id.*

*Covucci* is inapplicable for two reasons. First, excusing a defendant's failure to designate absences as FMLA leave, where the defendant had given the employee twelve months of leave, is fundamentally different than excusing Advance for directly calling Plaintiff's doctor to verify

-20-

information without ever requesting verification, or permission, from Plaintiff first, when Plaintiff requested and was approved for only one month of FMLA leave. Second, unlike *Covucci*, in the instant case, it would not be "an egregious elevation of form over substance" to hold Defendant liable for directly contacting Plaintiff's physician in violation of 29 C.F.R. § 825.307(a) and/or for not following the procedures set forth in 29 C.F.R. § 825.305(b) assuming that Defendant questioned the adequacy of Plaintiff's medical certification or found it to be incomplete.

The second case cited by Defendant is *Kitts v. Gen. Tel. North, Inc.*, 2005 U.S. Dist. LEXIS 20421 (S.D. Ohio 2005). In *Kitts*, the plaintiff alleged that the defendant violated the FMLA by failing to follow the procedures set forth in FMLA regulations when it suspected that she was abusing her FMLA leave. *Kitts*, 2005 U.S. Dist. LEXIS 20421 at *28. After the employer had granted the employee intermittent FMLA leave, the employee produced a note from a medical lab to support that her absence was protected by the FMLA. The employer then went to plaintiff's medical lab to verify the validity of the note. The employee argued that this violated 29 C.F.R. § 825.307(a). The court noted that the employer was "understandably suspicious" about the plaintiff's absence because when the employer questioned her, "her lies started to unravel." *Id.* at *32. The court also observed that, "nothing in the FMLA prohibits an employer from investigating allegations of dishonesty. . . ." *Id.* at *33. The court concluded that "because [d]efendant had already approved [p]laintiff's request for intermittent FMLA leave, [the] initial certification provisions [of 825.307 were] inapplicable." *Id.* at *30, *41.

*Kitts* can be distinguished on its facts. First, McIntyre furnished the doctor's note with the return to work date of May 14, 2003, *before* Defendant approved her request for FMLA leave, not *after*, as in *Kitts*. There is evidence in the record that the subsequent approval of Plaintiff's FMLA

-21-

leave, would have trumped any earlier return to work date stated in an earlier doctor's note. (Fruehan Dep. 140 stating, "the family leave would have superseded the letter.") Moreover, nothing in the record establishes that Defendant in the instant case thought Plaintiff was lying about her need for FMLA leave, thus obviating the need for any post-approval investigation. Finally, in *Kitts*, the plaintiff's FMLA leave had been approved *without a contingency*, and thus, the court concluded that the initial certification provisions did not apply. However, in the instant case Defendant maintains that it "approved [Plaintiff's FMLA] request for 30 days, from April 29 to May 29, subject to independent written confirmation by her health care provider verifying the medical necessity of Plaintiff's leave on those dates." (Def.'s Mot. for Summ. J. 5; Fruehan Decl. ¶ 10; Fruehan Dep. 142-143.) Therefore, unlike in *Kitts*, this court cannot conclude that the initial certification provisions of 29 C.F.R. § 825.307 are inapplicable. Consequently, *Kitts* is not controlling and Defendant's Motion for Summary Judgment on the grounds that any technical violation should be excused is denied.

### 5. Drake's Letter

Plaintiff argues that Defendant denied Plaintiff the FMLA benefits to which she was entitled by sending Plaintiff Drake's Letter and causing Plaintiff's "eventual termination." (Pl.'s Mot. For Partial Summ. J., 32-33.) Plaintiff refers to the evidence in the record showing that: (1) *after* Plaintiff's FMLA leave was approved, Drake, at the instruction of Human Resources Manager Fruehan and/or District Manager Clegg, directly contacted Plaintiff's doctor; (2) Defendant told Plaintiff it would proceed with her termination as of Thursday, May 22, 2003, if Plaintiff did not contact Advance by Wednesday, May 21, 2003; (3) Plaintiff believed she had been discharged and sought unemployment; (4) Defendant knew Plaintiff sought unemployment approximately 3 weeks

-22-

before actually terminating Plaintiff's employment, and; (5) Defendant failed to notify Plaintiff that she had not been discharged as of May 22, 2003.

Plaintiff's argument that Advance caused her eventual termination is similar to the argument made by the plaintiff in *Wilkerson v. Autozone, Inc.*, 152 Fed. Appx. 444, 449 (6th Cir 2005).  In *Wilkerson*, the employee took FMLA leave and when she believed her leave had expired she asked to return to work. *Wilkerson*, 152 Fed. Appx. at 447.  The employer requested that she obtain a doctor's note releasing her to return to work.  *Id*. The employee had her doctor fax a release, but the employer never told the employee that it had received the release, though the employee had inquired several times.  *Id.*  Subsequently, the employee was scheduled to work, but did not show up because she did not know that she was cleared for work. The employer then fired her for failure to arrive at work.  *Id.* at 448.  The Sixth Circuit held that the jury was entitled to find that the employer interfered with the employee's right to be reinstated because the employee would have returned to work on the date of her next scheduled shift, "but for" the employer's failure to inform her that it had received the release from the doctor.  *Id.* at 449.  The Sixth Circuit also found that a reasonable jury could conclude "on equitable estoppel grounds" that the plaintiff was entitled to reinstatement. *Id.* at 450.

In the instant case, pursuant to *Wilkerson*, there is evidence in the record from which a reasonable jury could conclude that "but for" Advance's failure to inform Plaintiff that Drake's Letter had been sent in error, Plaintiff would have returned to work on the date of her next scheduled shift; therefore, Advance caused Plaintiff's eventual termination for not reporting to work.  For example, Plaintiff stated that she did not receive Drake's Letter until after Thursday May 22, 2003, and consequently believed her employment had been terminated.  (McIntyre-Chambers

Aff. 14.)  Further, there is evidence in the record that Plaintiff had filed for unemployment weeks before Advance's actual termination of McIntyre, effective June 12, 2003.  (Drake Dep. at 76-77.)

However, there is also evidence in the record supporting the conclusion that Plaintiff would not have returned to work on the date of her next scheduled shift, regardless of whether she had notice that Drake's Letter was sent in error and that she was scheduled to work.  For example, the record shows that Plaintiff called Gravely, on May 21, the exact date Drake's Letter recited, and told Gravely that she intended to fax a new doctor's note to Gravely to substantiate her need for FMLA leave through May 29, and Plaintiff did subsequently fax that doctor's note to Gravely. (Gravely's May 21, 2003 E-mail to Drake and Fruehan, Ex. R, ECF No. 88; Dr. Rothman's Note, Ex. T, ECF No. 88.)  This evidence indicates that Plaintiff received Drake's Letter before May 22, 2003, complied with it, and therefore did not believe she had been terminated.  Additionally, there is evidence in the record supporting Defendant's argument that Plaintiff did not intend to return to work at Advance, regardless of whether she had notice that she had not been terminated pursuant to Drake's Letter and/or that she was on the schedule to work June 11, 12, and 13, 2003.[7]  Gravely's declaration states that Plaintiff advised Gravely that Plaintiff's doctor did not want Plaintiff to return to Advance and Plaintiff did not intend to return to Advance.[8]  (*See* Gravely Declaration, Ex. QQQ, ECF No. 101.)

---

[7]     It is clear that McIntyre was never notified by Defendant that Drake's Letter was sent in error.  Additionally, Defendant has pointed to nothing in the record to establish that it attempted to notify Plaintiff that she was scheduled to work on June 11, 12, and 13, 2003.

[8]     *See* separate Order dated January 10, 2007, denying Plaintiff's pending Motion to Strike Gravely's Declaration as Plaintiff has suffered no prejudice from the declaration at the summary judgment stage.

-24-

This court finds that there is evidence in the record supporting the conclusion, that but for Advance's failure to inform Plaintiff that Drake's Letter had been sent in error, Plaintiff would have returned to work on the date of her next scheduled shift. However, there is also evidence in the record that Plaintiff did not believe that Advance had processed her termination on Thursday May 22, 2003. At the summary judgment stage, the court finds that because there is evidence in the record that would support a jury finding either way, Plaintiff's Motion for Partial Summary Judgment based on the argument that Advance interfered with her FMLA rights by sending Drake's Letter and causing her eventual termination is denied.

### 6. Advance's Attendance and Notification Policy

Defendant argues that summary judgment should be granted in its favor regarding Plaintiff's FMLA claim because it honored Plaintiff's leave of absence and expected her to return to work when it ended. Defendant maintains that Plaintiff directly violated Advance's attendance and notification policies when she failed to appear for work on June 11, 12, and 13, and failed to "call in" to report her status. Plaintiff argues that she did not appear for work on June 11, 12, and 13 because she believed she had been terminated on May 22, 2003.

As this court discussed above, there are genuine issues of material fact in dispute regarding whether Plaintiff actually believed Advance had processed her termination on May 22, 2003, and as to whether Plaintiff would have returned to work on the date of her next scheduled shift, regardless of whether she had notice. Therefore, summary judgment is inappropriate.

### 7. Defendant's Argument that Plaintiff was Unable to Return to Work

Defendant further argues that Plaintiff was unable to return to work, and therefore, her FMLA claim must fail and summary judgment must be granted in its favor. An employer does not

violate the FMLA "when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Edgar v. JAC Products, Inc.*, 443 F. 3d 501, 506-07 (6th Cir. 2006) (affirming summary judgment in employer's favor).  Nothing in the record conclusively establishes that Plaintiff was "indisputably unable to return to work a the conclusion" of her 4-week period of leave.[9]  *Edgar*, 443 F. 3d at 506-07.  Additionally, Plaintiff disputes that she was unable to return to work at the end of her FMLA leave.  (Chambers Decl. 12, ECF No. 104-3.)  Further, Plaintiff argues that even if her health condition prevented her from returning at the end of her original leave, McIntyre would have had the right to an extension of her leave had her employment not been terminated.  (*See* Pl.'s Reply, 21.)   As there are genuine issues of material fact regarding whether or not Plaintiff was able to return to work at the conclusion of her FMLA leave, summary judgment on this ground is inappropriate and Defendant's Motion for Summary Judgment is denied.

## B.  FMLA-Related Actual Damages

Defendant argues that Plaintiff cannot prove that she sustained actual damages resulting from a claimed FMLA violation.  In order to prevail on a claim for damages, a plaintiff must produce facts sufficient to show causation between the violation of the statute and an injury.  The FMLA's remedial scheme does not require that individuals be compensated merely because an employer has violated the statute.  The Act provides no relief unless the employee has been prejudiced by the violation.  Under the FMLA, an employer is only liable for compensation and

---

[9]     *See* separate Order dated January 10, 2007, granting Plaintiff's Motion to Strike Defendant's exhibits CCC, EEE, and FFF based on Ohio Revised Code § 4141.21 prohibiting the use of documents from the Department of Job and Family Services as evidence.

benefits lost "by reason of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(I), for other monetary losses sustained as a "direct result of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, 29 U.S.C. § 2617(a)(1)(B). *See Ragsdale v. Wolverine World News, Inc.*, 535 U.S. 81, 89 (2002).  Section 107 of the FMLA (29 U.S.C. §2617) sets forth the exclusive remedies available under the FMLA and limits monetary damages to "wages, salary, employment benefits, or other compensation lost or denied to [an eligible] employee by reason of the violation" (commonly referred to as "back pay" or "lost wages"); or, if no such compensation has been lost or denied, "actual monetary losses sustained by the employee as a direct result of the violation." 29 U.S.C. §2617(a)(1)(a)(I).  When viewing the evidence in a light most favorable to Plaintiff, this court finds that a reasonable jury could conclude that Plaintiff sustained actual damages resulting from the alleged violations of the FMLA by Defendant.

Defendant also argues that Plaintiff was not entitled to any pay while she was out on FMLA leave and thus Plaintiff would not have been paid any wages while out on FMLA leave.  Defendant restates its position that Plaintiff's medical condition precluded her return to Advance when her leave ended and thus she did not lose wages because she could not and would not have earned any. This court has already concluded that there are genuine issues of material fact that preclude an award of summary judgment with respect to whether Plaintiff was able to return to work at the end of her FMLA leave.  Consequently, this court cannot grant summary judgment based on this argument.

Finally, Defendant argues that Plaintiff has not, and cannot, produce any documents reflecting any of her claimed actual damages and therefore, any such damages would be

-27-

impermissibly speculative, as well as legally defective, requiring summary judgment in Advance's favor. Defendant cites to Advance's Memorandum Ex. Z, No. 3 in support, but there is no exhibit Z, number 3 in the record. In the instant case, Plaintiff maintains she has calculated her lost wages and lost benefits by subtracting the amounts Plaintiff has made at other employment from the approximate amount she would have made had she remained employed by Defendant. (Pl.'s Answers and Objections to Defendant[']s First Set of Interrogatories, Ex. ZZ, ECF No. 88.) Plaintiff also asserts that on May 26, 2005, Plaintiff produced her full tax returns, including her W-2s from subsequent employment. (*See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. 34, ECF No. 104; Supplementation Letter, Ex. ZZ, ECF No. 88.) Further, McIntyre may testify as to her compensation and hours worked while at Advance, and as to her compensation and hours worked subsequently. (*See* Chambers Decl. at 9, ECF No. 104-3.) Advance may cross-examine McIntyre if it wishes to cast doubt on the credibility of her calculations. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's claim for FMLA-related damages is denied.

### C. FMLA-Related Liquidated Damages

Defendant states that Plaintiff does not seek an award of liquidated damages in relation to her FMLA claim. (Def.'s Mot. for Summ. J. 27.) Plaintiff argues that although her Amended Complaint does not specifically mention liquidated damages, she requested "such other relief as the Court may deem appropriate." (Am. Compl. 21, ECF No. 36.) The FMLA provides that employers "shall" be liable for liquidated damages equal to the damages due to lost compensation plus interest, "except that if an employer who has violated [the FMLA] proves to the satisfaction of the court that the act or omission . . . was in good faith . . . such court may, in the discretion of the court, reduce the amount of the liability. . . ." 29 U.S.C. § 2617(a)(1)(A)(iii); *see also Arban v. W. Publ. Corp.*,

-28-

345 F.3d 390, 407 (6th Cir. 2003) ("[I]f an employer proves that it acted 'in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation' of the FMLA, the court may reduce the damages.") (quotation omitted).  To the extent Defendant's Motion for Summary Judgment sought to preclude Plaintiff from seeking an award of liquidated damages, that part of the Motion is denied.

### D.  Plaintiff's Hostile Environment Claim

Plaintiff's Second Amended Complaint states a cause of action for sexual discrimination based on hostile environment in violation of O.R.C. § 4112.  In the instant case, both parties move for summary judgment on Plaintiff's hostile environment claim.  Section 4112.02 (A) states that "[i]t shall be an unlawful discriminatory practice . . . for any employer, because of the . . . sex . . . of any person, . . . to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  O.R.C. § 4112.02 (A) (2006).   Violations of O.R.C. § 4112 are measured by the same standards used to analyze Title VII violations.  *See  Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999) ("The Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII of the Civil Rights Act of 1964 are likewise applicable in determining whether a violation of Ohio Rev. Code § 4112 has occurred. Thus, the federal case law governing Title VII actions is generally applicable to cases involving alleged violations of Chapter 4112.") (citing *Little Forest Med. Ctr. v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 575 N.E.2d 1164, 1167 (Ohio 1991)).

The Supreme Court of Ohio has determined that in order to establish a claim of hostile environment sexual harassment, a plaintiff must show: "(1) that the harassment was unwelcome,

(2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hampel v. Food Ingredients Specialties*, 89 Ohio St. 3d 169, 176-177 (2000). The Ohio Supreme Court further instructed,

> the issue of "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Id.* at 180 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Additionally, the *Hampel* court noted,

> it is generally understood that the "severe or pervasive" requirement does not present two mutually exclusive evidentiary choices, but reflects a unitary concept where deficiencies in the strength of one factor may be made up by the strength in the other. *See, e.g.*, *Ellison v. Brady* (C.A.9, 1991), 924 F.2d 872, 878 ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"); *Robinson* [*v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1524 (M.D.Fla.1991)] ("greater severity in the impact of harassing behavior requires a lesser degree of pervasiveness in order to reach a level at which Title VII liability attaches").

*Hampel*, 89 Ohio St. 3d at 181. In the instant case, there is no dispute that the harassment was based on sex and that the harassment was committed by a supervisor. Therefore, only the first and third elements are at issue: whether the harassment was unwelcome and whether the harassment was

-30-

objectively and subjectively severe or pervasive enough to affect the terms of Plaintiff's employment.

## 1. Unwelcome

The Supreme Court of Ohio has determined that in order to establish a claim of hostile environment sexual harassment, a plaintiff must first show that the harassment was unwelcome. *See Hampel*, 89 Ohio St. 3d at 176-177. Defendant argues that is it "questionable" whether Plaintiff can meet her burden of proof on this element. (See Def.'s Mot. for Summ. J., 31, FN 25.) This court finds that there are genuine issues of material fact in dispute regarding this element. Plaintiff states that all of Moyer's behavior was unwelcome. (McIntyre-Chambers Aff. ¶ 5.) Plaintiff also stated at her deposition that she never had a romantic or sexual relationship with Moyer. (Chambers Dep. 214.) Additionally, Assistant Manager Zobrist stated at her deposition that McIntyre never told Zobrist that she liked or wanted Moyer's attentions and that McIntyre did not like Moyer's behavior towards her. (Zobrist Dep. at 50, 38.) However, the record also reflects that Plaintiff went on outings with Moyer outside of work, alone and with her daughter.[10] (*See* Pl.'s Answers to Interrogatories No 10.) Moreover, according to Moyer, McIntyre had engaged in "consensual sexual relations" with him. (Moyer Decl. ¶ 6, Ex. PPP, ECF No. 101.)

As the Supreme Court has observed, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact . . . ." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (U.S. 1986). As this essential element of Plaintiff's *prima facie* hostile work environment claim is a factual issue

---

[10]     Plaintiff contends that she was given the choice of going out with Moyer or losing her job. (McIntyre-Chambers Dep. 228.)

that depends upon credibility determinations, it cannot be decided on summary judgment. *Society Nat'l Bank v. U.S.A.*, 1996 U.S. Dist. LEXIS 8136, at *6 (S.D. Ohio1996); *USHA Schaffrath v. Akron/Summit/Medina Private Industrial Council*, 674 F. Supp. 1308, 1313 (N.D. Ohio 1987).

2. Sufficiently Severe or Pervasive
to Affect the Terms, Conditions, or Privileges of Employment

For a hostile work environment claim, the plaintiff must show that the harassment was so severe and pervasive that it created a work atmosphere so hostile as to constitute a change in the terms or conditions of employment. *See Mast v. Imco Recycling of Ohio*, 58 Fed. Appx. 116, 118 (6th Cir. 2003) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21,(1993)). The harassment must create a work atmosphere that is both objectively and subjectively hostile. *Id.* Conduct that is offensive but fails to satisfy both the subjective and objective standards is not actionable. *Vitatoe v. Lawrence Industries, Inc.*, 153 Ohio App. 3d 609, 616-17 (Cuyahoga Cty. 2003).

There is no dispute as to whether Moyer's behavior was *objectively* sufficiently severe or pervasive to affect the terms, conditions, or privileges of Plaintiff's employment. It is undisputed that Moyer's inappropriate behavior included, among other things, pulling Plaintiff's shorts down and pulling her onto his lap, grabbing her and wrestling her to the floor, grabbing her breasts, reaching up her shorts when she was on a ladder, throwing pieces of paper down her shirt and then retrieving them, and poking her in the butt and groin area. (*See* McIntyre Dep.153-155; Zobrist Dep. 61-62; Luna Dep. 37.) Plaintiff also states and Defendant does not dispute that Moyer would ask her why she did not love him, and told her that because his girlfriend Carla was gone it was McIntyre's job to "take care of business." (McIntyre's Notes, 1, 6, Ex. XX, ECF No. 88.)

Defendant argues that in the instant case Plaintiff did not *subjectively* find Moyer's harassment to be so severe or pervasive that it created an actionable hostile work environment.

-32-

First, Defendant argues that Plaintiff did not report Moyer's behavior to upper management for over a year.  The court does not find this argument persuasive, as the record is clear that Plaintiff did report Moyer's conduct to Zobrist, a supervisor.  The record is also clear that "in March 2002, [Zobrist] had dissuaded Plaintiff from reporting Moyer to the corporate office."  (*See* Def.'s Mot. for Summ J. 16, ECF No. 87-2.)

Second, Defendant argues that Plaintiff's contemporaneous journal entries reflect that her reaction to Moyer's conduct was more of an occasional annoyance with Moyer's "moodiness" rather than outrage or intolerance, as the journal entries fail to mention a single incident that Plaintiff perceived as serious enough to describe as "sexual harassment."  (Journal Entries, Ex. L, ECF No. 88.)  Plaintiff argues that she was keeping a journal to provide a record of stability for her custody case and that is why she failed to mention the sexual harassment.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. 39, ECF No. 104.) When reviewing a motion for summary judgment, this court must view all of the evidence and any inferences that may be drawn from that evidence in the light most favorable to the nonmoving party. This court finds that a reasonable jury could conclude that Plaintiff found Moyer's conduct to be subjectively severe or pervasive though she failed to write about it in her journal.

Defendant further argues that the reason Plaintiff did finally report Moyer's conduct to Marion Store Manager Shaffer and District Manager Clegg was not because she found her work environment subjectively severe or pervasive, but because Moyer had reprimanded Plaintiff's friend Sue Schiefer.  (McIntyre Journal Entries, Ex. L, ECF No. 88; Employee Action Report Against Sue Schiefer Ex. HHH.)  This court finds that what motivated Plaintiff to report Moyer's sexual harassment to Shaffer and Clegg when she did is a factual issue to be determined by a jury.

Defendant also relies on evidence in the record showing that Plaintiff earned high marks during her annual job performance evaluation, that there were no disciplinary actions against her for poor or inadequate job performance, and that there were no complaints about her job performance during the time. (*See* Non-Exempt Performance Appraisal, Ex. GGG.) This indicates that Moyer's conduct did not effect Plaintiff's job performance. However, the record also includes testimony and documentation indicating that McIntyre did find Moyer's harassment to be subjectively severe and pervasive, and that she was unable to perform effectively whenever Moyer interacted with her. For example, McIntyre stated at her deposition that Moyer would follow her through the store, threatening her and grabbing her; and that as a result she was unable to do her job and that at times Moyer physically prevented her from doing her job by grabbing her and wrestling her to the ground while she was working. (McIntyre-Chambers Dep. 154.) Assistant Manager in Training Luna stated at her deposition that Moyer's harassment interfered with Plaintiff's work performance and that at one point in time Luna told Moyer to "leave [McIntyre] alone, she's doing her job." (Luna Dep. at 112-113.) In addition, Assistant Manager Zobrist stated at her deposition that McIntyre did a "great job" when she was not around Moyer, but that when Moyer was around she was uncomfortable and there was tension. (Zobrist Dep. 69, ECF No. 74.) Because it is a disputed issue of material fact whether Plaintiff subjectively found Moyer's harassment to be so severe or pervasive that it created an actionable hostile work environment, this court finds that summary judgment in favor of either party is inappropriate.

### E. Defendant's Affirmative Defense

The Ohio Supreme Court has consistently held that federal case law addressing Title VII is generally applicable to cases involving O.R.C. Chapter 4112. *See Hampel*, 89 Ohio St. 3d at 175; *Gibson v. Federal Express Corp.*, 2001 Ohio App. LEXIS 76 * 8 (Ohio Ct. App. 2001). Once a plaintiff has established a *prima facie* case for hostile environment, she must show that her employer bears responsibility for the harassment. If the harassing party was the plaintiff's supervisor, the employer will be strictly liable where the harassment culminated in a tangible employment action against the plaintiff, such as "such as discharge, demotion, or undesirable reassignment." *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). If, however, there is no tangible employment action, the employer can raise an affirmative defense, which has come to be known as the *Ellerth Faragher* affirmative defense. *See Collette v. Stein-Mart, Inc.*, 126 Fed. Appx. 678, 682 (6th Cir. 2005). The *Ellerth Faragher* affirmative defense is comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Gibson*, 2001 Ohio App. LEXIS 76 at *12 (quoting *Ellerth*, 524 U.S. at 765). In the instant case, Plaintiff does not argue that she suffered a tangible employment action, therefore, Defendant may raise the *Ellerth Faragher* affirmative defense.

### 1. The First Prong of the *Ellerth Faragher* Affirmative Defense

Defendant argues that it has fulfilled the first prong of the *Ellerth Faragher* affirmative defense because it exercised reasonable care to prevent and correct promptly any sexually harassing

-35-

behavior by having an anti-harassment policy in place and by promptly conducting an investigation of Plaintiff's complaint of sexual harassment, which culminated in the termination of both Moyer and Zobrist. The Sixth Circuit, and other circuits, "treat the existence of an anti-harassment policy (with complaint procedures) as strong evidence that the employer took sufficient general measures to prevent harassment." *Collette*, 126 Fed. Appx. at 685 (citing *An v. Regents of Univ. of Cal.*, 94 Fed. Appx. 667, 674 (10th Cir. 2004) ("the sexual harassment policy and its dissemination generally evidence appropriate efforts to prevent sexual harassment"); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) ("not necessarily dispositive" but "an important consideration")).

In the instant case, Defendant has established that Plaintiff received, reviewed and understood the Employee Handbook. (Ex. Z-1.) The Employee Handbook contains a section regarding Advance's sexual harassment policy and states: "Advance Auto Parts considers sexual harassment in the workplace unacceptable conduct, which will not be tolerated." (*Id.* at 15.) The Employee Handbook instructs employees "How to Report Harassment" and states,

> [a]ny employee who feels he/she or someone with whom he/she works has been subjected to sexual harassment should promptly report the conduct to his/her immediate supervisor. Such matters cannot be resolved unless they are promptly and truthfully reported. If an employee is not comfortable reporting an incident to his/her immediate supervisor, a complaint may be filed with the next level(s) of management, or the Human Resources Department. Complaints may also be reported on the Employee Hotline. . . .

(*Id.* at 16.) Additionally, McIntyre's on-line training records reflect that she had completed programs that included Advance's sexual harassment policy and procedures. (Ex. EE.)

Though Advance had, and distributed, an anti-sexual harassment policy, this fact is not conclusive as to whether Advance has satisfied prong one of the *Ellerth Faragher* affirmative

-36-

defense.  *See Clark v. UPS*, 400 F.3d 341, 349 (6th Cir. 2005) ("While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there.")  As the Sixth Circuit explained in *Clark*,

> "The law is clear that an employer may not stand by and allow an employee to be subjected to a course of . . . sexual harassment by co-workers or supervisors. Rather, once an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997) (internal quotation marks and citations omitted). Thus, regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future. [citation omitted]

*Clark v. UPS*, 400 F.3d 341, 349 (6th Cir. 2005).

Defendant maintains that once Plaintiff complained to Shaffer and Clegg, Advance conducted an investigation of Plaintiff's complaint of sexual harassment.  Fruehan and Clegg found that Moyer had engaged in prohibited misconduct and Advance terminated Moyer's employment. (*See* Excerpts from Moyer's Personnel File, Ex. SS, ECF No. 88.)  Advance's investigation also determined that Zobrist had failed to forward Plaintiff's complaints to Human Resources or to Moyer's immediate supervisor and consequently Zobrist was also fired. (*See* Zobrist Separation Notice, Ex. WW, ECF No. 88.)

For the reasons stated *infra*, this court denies Defendant's Motion for Summary Judgment because genuine issues of material fact exist regarding whether Defendant can establish the second prong of the *Ellerth Faragher* affirmative defense.  Therefore, this court need not decide the issue of whether Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior, which would require determination of whether the year-long delay by Assistant

-37-

Manager Zobrist in taking any action on Plaintiff's sexual harassment complaints would preclude a finding in Defendant's favor.

### 2. The Second Prong of the *Ellerth Faragher* Affirmative Defense

The second prong of the *Ellerth Faragher* affirmative defense  requires that the employer show that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Gibson*, 2001 Ohio App. LEXIS 76 at *12 (quoting *Ellerth*, 524 U.S. at 765); *Collette*, 126 Fed. Appx. at 686.  The Supreme Court recognizes that the "primary objective" of Title VII is not to provide redress, but to prevent harm. That objective is furthered when the law requires both employer and employee to act reasonably to prevent harassment before it happens, and then to correct it promptly if it does. *Ellerth*, 524 U.S. at 764-65; *Faragher*, 524 U.S. at 806.

In an attempt to negate the availability of the *Ellerth Faragher* affirmative defense, Plaintiff points to case law from the Fifth and Eleventh Circuits which provides that if an employee complies with an employer's anti-sexual harassment policy, then the employer cannot establish the second prong of the *Ellerth Faragher* affirmative defense.  *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2nd Cir.1998); *Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 (11th Cir. 2000) ("The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the company's policy."). Advance's anti-harassment policy instructs as follows:

> [a]ny employee who feels he/she or someone with whom he/she
> works has been subjected to sexual harassment should promptly
> report the conduct to his/her immediate supervisor.  Such matters
> cannot be resolved unless they are promptly and truthfully reported.
> If an employee is not comfortable reporting an incident to his/her
> immediate supervisor, a complaint may be filed with the next level(s)

-38-

of management, or the Human Resources Department.  Complaints *may* also be reported on the Employee Hotline. . . .

(Employee Handbook, 16,  Ex. B.)  Plaintiff argues she did comply with Advance's complaint procedure because she repeatedly reported Moyer's harassment to her supervisor, Zobrist. Defendant argues that Plaintiff did not follow Advance's anti-harassment complaint procedures as she did not "promptly report the conduct" nor did she ever report Moyer's behavior by calling the employee hotline.

Defendant also points to evidence in the record showing that Advance's "Open Door" policy required an employee whose complaint is not satisfactorily resolved to report it "up the ladder":

> Any employee with a suggestion, problem, complaint, or who wishes to report misconduct or a violation of Company policy, should contact his/her immediate supervisor about the matter. If the employee does not feel comfortable discussing the matter with his/her immediate supervisor, or if the employee is not satisfied with how the immediate supervisor resolved the matter, the employee *should* contact the next level of management or the Human Resources Department.

(Employee Handbook, 3 Ex. B (emphasis added). )  Defendant argues that once Plaintiff knew that Zobrist had not effectively resolved her complaint, and that Zobrist did not intend to pass Plaintiff's complaint on to Moyer's superiors, Plaintiff was required to contact "the next level of management" or human resources. Plaintiff failed to do so. (McIntyre-Chambers Dep. 111-112, 223-224.) Defendant argues that  failure independently violated Advance's reporting procedures and likewise proves the second element of Advance's *Ellerth Faragher* affirmative defense.  Plaintiff argues that the language in the "Open Door" policy  is not mandatory.  Further, Defendant also admits that Zobrist dissuaded Plaintiff from reporting the sexual harassment to upper management.  Viewing

-39-

the evidence in the light most favorable to Plaintiff, this court finds that a reasonable jury could conclude that Plaintiff complied with Advance's anti-harassment policies.

Failure to follow an employer's complaint procedures is not the only way to establish the second prong of the *Ellerth Faragher* affirmative defense.   An employer can prove the second element of the affirmative defense by demonstrating that the "plaintiff employee unreasonably failed . . . to avoid harm otherwise." *Brown v. Perry*, 184 F.3d 388, 395-97 (4th Cir. 1999) (quotations omitted) (summary judgment in employer's favor affirmed, as evidence that plaintiff continued to put herself in harm's way by socializing with, and being alone in a hotel room with, the harassing supervisor established the second element of the *Ellerth Faragher* affirmative defense).   As the Supreme Court stated in *Faragher*,

> If the plaintiff unreasonably  failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care . . . .

*Faragher*, 524 U.S. at 806-807.  Defendant argues that Plaintiff failed to otherwise avoid harm by socializing with Moyer outside of work, failing to call the anonymous employee hotline, and failing to report Moyer's behavior to any of Moyer's supervisors, such as District Manager Clegg.

Additionally, an unreasonable delay in reporting sexual harassment may constitute an unreasonable failure to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm. *See Conatzer v. Medical Prof'l Bldg. Servs.*, 255 F. Supp. 2d 1259, 1269-70 (N.D. Okla. 2003) (summary judgment entered in employer's favor, as plaintiff's failure to report her sexual harassment complaint until seventeen days after the first serious incident constituted an unreasonable failure to take advantage of any of her employer's complaint

-40-

procedures).  Defendant argues that Plaintiff failed to report Moyer's alleged misconduct to any Advance supervisor for more than three full months after she claims the harassment began (until her report to Zobrist in late March 2002).  Advance's sexual harassment policy requires an employee to report sexual harassment complaints "promptly" and thus, Plaintiff did not comply with Advance's anti-harassment policy.  Further, Defendant argues that Plaintiff knew that Zobrist had not forwarded her complaint to corporate headquarters or to Moyer's supervisors and that Plaintiff knew that she herself could report a complaint directly to corporate headquarters by calling the anonymous toll-free employee hotline, but failed to do so for over a year.

Viewing all of the evidence and any inferences that may be drawn from that evidence in the light most favorable to Plaintiff, this court finds that there are genuine issues of material fact in dispute.  Consequently, Defendant's Motion for Summary Judgment based on the *Ellerth Faragher* affirmative defense is denied.

### F. Plaintiff's *Quid Pro Quo* Claim

Defendant moves for summary judgment on Plaintiff's *quid pro quo* claim.  In Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff appears to abandon her *quid pro quo* claim, indicating that she "mistakenly listed [that claim] as a separate cause of action" and "there is no question that [Plaintiff's] allegations focus on a hostile work environment." (Pl.'s Opp'n to Def.'s Mot. for Summ. J. 55, ECF No. 104.)  Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's *quid pro quo* claim is granted.

### G.  Plaintiff's Retaliation Claim

Defendant moves for summary judgment on Plaintiff's retaliatory discharge claims under O.R.C. § 4112.  Under Ohio law, an employer is prohibited from retaliating against an employee

-41-

who "has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing" related to the opposition of unlawful discriminatory practices defined in the statute. Ohio Rev. Code § 4112.02(I). Title VII case law is applicable to retaliation claims under O.R.C. § 4112. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128 (Ohio 1981) (finding Title VII case law applicable to cases involving alleged violations of Ohio Revised Code § 4112); *see also Sosby v. Miller Brewing Co.*, 2006 U.S. App. LEXIS 29194 (6th Cir. 2006) (applying Title VII case law to retaliation claim under Ohio Revised Code § 4112).

To establish a *prima facie* case of retaliation without any direct evidence, a plaintiff must show the following: "(1) she engaged in protected activity; (2) the employer knew of her protected activity; (3) she suffered an adverse employment action; [footnote omitted] and (4) there was a causal connection between the protected activity and the adverse employment action." *Sosby*, 2006 U.S. App. LEXIS 29194 * 9 (citations omitted). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* at *9-10 (citations omitted). If the employer meets its burden, the plaintiff must then show that the employer's stated reasons are a pretext for retaliation. *Id.* at *10.

Plaintiff argues that she has established a *prima facie* case of retaliation because she: (1) reported Moyer's sexual harassment which was a protected activity;[11] (2) the employer knew of her

---

[11]    Plaintiff asserts in her Opposition to Defendant's Motion for Summary Judgment that she was also retaliated against for taking FMLA leave. (Pl.'s Opp'n to Def.'s Mot. for Summ. J., p.58.) However, Plaintiff's Amended Complaint only states a cause of action for retaliation under O.R.C. § 4112. (*See* Pl.'s Am. Compl. ¶¶ D, 100, 101.) Additionally, Plaintiff's Amended Complaint clearly states, "Defendant terminated Ms. McIntyre's employment in retaliation for her complaining about sexual harassment and discrimination." (Am. Compl. ¶ 88; *see also* ¶ 94.)

-42-

protected activity; (3) she suffered an adverse employment action when Defendant changed her schedule and also when Defendant subsequently terminated her employment and; (4) there was a causal connection between the protected activity and adverse employment action.

Plaintiff argues that the changes to her schedule, requiring her to work late on "truck night," constitute an adverse employment action. The Supreme Court recently addressed the "adverse employment action" standard for retaliation claims in violation of Title VII in *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006). There, the Court concluded, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (citation and quotation omitted). The Court noted that the adverse employment action standard was to be objective and that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Id.*

This court declines to consider whether the changes to Plaintiff's schedule, requiring her to work late one night a week, constitute an adverse employment action, because this court finds that Plaintiff is unable to establish the necessary causal link between the claimed "protected activity" (her sexual harassment complaint) and the claimed "adverse employment action" (the rescheduling or termination of her employment), as discussed below.

In order to establish a causal connection between the protected activity and adverse employment action, "a plaintiff must present evidence 'sufficient to raise [an] inference that her protected activity was the likely reason for the adverse action.'" *Sosby*, 2006 U.S. App. LEXIS 29194 at *11 (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)

(quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).  Plaintiff has failed to point to evidence in the record "sufficient to raise [an] inference" that her report of sexual harassment was the likely reason for her schedule changes and termination, other than the fact that these incidents occurred *after* she reported Moyer's conduct.

Plaintiff cites *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004) to support her position that temporal proximity alone is sufficient to raise an inference of retaliatory discrimination when there is no other compelling evidence. *But see Parnell v. West*, 1997 U.S. App. LEXIS 12023, at *7-8 (6th Cir. 1997) ("temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence."); *Sosby*, 2006 U.S. App. LEXIS 29194 * 11-12 (stating that "mere temporal proximity was insufficient").  In *Singfield*, the plaintiff had filed a claim for retaliatory discharge after his employer discharged him three months after he filed charges of discrimination with the EEOC.  *Singfield*, 389 F.3d at 563. The Sixth Circuit concluded that the temporal proximity between Plaintiff's complaint and subsequent termination was significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a *prima facie* case of retaliation.  *Id.*

In the instant case, Plaintiff reported Moyer's sexual harassment in December of 2002. Shortly thereafter, Defendant terminated the employment of Moyer and Zobrist, and retained Plaintiff.  Defendant changed Plaintiff's schedule five months later, in May of 2003 and terminated Plaintiff's employment in June of 2003.  This court finds that the passage of five to six months, rather than the three at issue in *Singfield*, is too long to support an inference of a causal link.  *See e.g. Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000)  (quoting *Parnell v. West*, 1997 U.S. App. LEXIS 12023, at *3 (6th Cir. 1997) ("[c]ases that have permitted a *prima facie* case to

-44-

be made based on the proximity of time have all been short periods of time, usually less than six months.").  As Plaintiff has not pointed to any other evidence supporting an inference of retaliation based on the protected activity of filing a sexual harassment complaint, Defendant's Motion for Summary Judgment on Plaintiff's Retaliation claim is granted.

### H. Plaintiff's Negligent Supervision Claim

Defendant moves for summary judgment on Plaintiff's negligent supervision claim.  To prevail on a claim for the negligent hiring, supervision and retention of an employee by an employer, a plaintiff must show the following: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries."  *Steppe v. KMart Stores*, 136 Ohio App. 3d 454, 465 (Ohio Ct. App. 1999) (citations omitted).

The third and fifth elements are at issue in the instant case.  Regarding the third element, Plaintiff alleges that Advance had actual or constructive knowledge of Moyer's propensity for sexual harassment and points to the following evidence in the record in support of her claim: (1) Defendant knew Moyer was a self described "womanizer," (Clegg Dep. 29) and allegedly had a license plate that read "SHAG IT" (Clegg. Dep. 37); (2)  Clegg had allegedly stated to Zobrist, "we have been watching you for a long time and we wanted to see if you would make anything – any move – any kind of move" (Zobrist Dep. 55); (3) Clegg  responded to Plaintiff's sexual harassment complaint by saying he had been "waiting on your call"  (McIntyre-Chambers Dep. 235-236); (4) Clegg allegedly told Susan Schiefer that he was "waiting for us females to come forward" (Schiefer

-45-

Dep. 128, 230-231); and (5) the fact that Zobrist, Plaintiff's supervisor, personally observed the harassment.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. 61.)

Defendant argues that it did not have actual or constructive knowledge of Moyer's sexual harassment and points to evidence in the record in support of its position.  Defendant notes that there is no evidence that Clegg, or any of Moyer's supervisors, personally witnessed any of Moyer's alleged bad behavior.  Defendant points to evidence showing that Clegg did not tolerate Moyer's "womanizer" comment; that Clegg pulled aside Moyer, reprimanded him and that Moyer never again made a similar remark in Clegg's presence. (Clegg Dep. pp. 28-30.) Defendant maintains that Clegg did not know about Moyer's personalized license plates, which read "SHAG IT." (Clegg Dep.37.)  Clegg stated at his deposition that before Plaintiff's late-December 2002 complaint, he did not know or even suspect that Moyer had been engaging in inappropriate sexual misconduct at the store; when the stories began to unfold, he says he "about fell out of [his] chair." (Clegg Dep. 48, 69.)  Defendant also points to Plaintiff's journal entry, which  noted that Clegg and Fruehan seemed to be in "disbelief" when she started disclosing the specifics of the sexual  harassment, in support of their position that it did not have actual or constructive knowledge of the sexual harassment.  (Plaintiff's Journal Entry, Ex. L.).

When reviewing a motion for summary judgment, this court must view all of the evidence and any inferences that may be drawn from that evidence in the light most favorable to the nonmoving party.  In doing so, this court finds that there are genuine issues of material fact regarding Advance's knowledge of Moyer's propensity for sexual harassment.  Accordingly, summary judgment is inappropriate.  Consequently, this court need not reach the fifth element necessary for Plaintiff's negligent retention and supervision claim.

## I. Termination in Violation of Ohio Public Policy

Defendant moves for summary judgment on Plaintiff's termination in violation of Ohio public policy claim.  As the Court in *Vitatoe* explained, though most employment in Ohio is at-will; thus, foreclosing a claim of wrongful discharge, there are exceptions to the at-will doctrine in cases where public policy would be violated by the discharge. *Vitatoe*, 153 Ohio App. 3d at 618 (citations omitted).  To establish a claim of discharge in violation of public policy, the plaintiff must show the following:

> First, that clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); second, that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); third, that the dismissal was motivated by conduct related to public policy (the causation element); and finally, that the employer lacked overriding legitimate business justification for the dismissal (the overreaching justification element).

*Id.* at 618-619 (citing *Painter v. Graley*, 70 Ohio St.3d 377 (1994)).  Defendant argues that Plaintiff cannot establish causation.  Plaintiff fails to respond to Defendant's Motion for Summary Judgment on this claim or to identify what public policy was jeopardized, leaving the court to guess at the basis.  Plaintiff only states, "Advance cannot show the absence of material facts as to [her] retaliation claim and her derivative public policy claim" and then discusses Plaintiff's conversation with Drake and Clegg regarding the scheduling and the requirement that Plaintiff work late on "truck night," apparently as evidence of "retaliatory animus."   (Pl's Opp'n to Def.'s Mot. for Summ. J. 56-57.)  Plaintiff fails to make clear how these facts are material or how they support the necessary elements of her discharge in violation of Ohio public policy claim.  (*See* Pl's Opp'n to Def.'s Mot. for Summ. J. 56-60.)

-47-

This court finds that Plaintiff has failed to establish a *prima facie* case of discharge in violation of public policy as Plaintiff has failed to address any of the four necessary elements as set forth by the Ohio Supreme Court in *Painter v. Graley*,70 Ohio St.3d 377.  Therefore, Defendant's Motion for Summary Judgment on this issue is granted.

### J. Plaintiff's State Law Claims for Punitive Damages and Attorney's Fees

Defendant moves for summary judgment on Plaintiff's claims for punitive damages and attorney's fees.  Ohio courts have made clear that O.R.C. "4112.99 does not, on its face, contain provisions entitling the prevailing party to an award of attorney fees."  *Stepic v. Penton Media, Inc.*, 2000 Ohio App. LEXIS 5888 *30  (Ohio Ct. App. 2000) (citing *Sutherland v. Nationwide General Ins. Co.*, 102 Ohio App. 3d 297, 299 (10th App. Dist. 1995)).  Attorney fees may only be awarded where punitive damages have been found.  *Id* at 30-31(citing *Griffin v. Lamberjack*, 96 Ohio App. 3d 257, 266 (1994)).  Ohio Revised Code § 4112.99 authorizes an award of punitive damages in civil employment discrimination actions only upon evidence of actual malice.  *Id.* at *27-28 (citing *Rice v. CertainTeed Corp.*, 84 Ohio St. 3d 417, 422 (1999)).  Further, O.R.C. § 2315.21, regarding damage awards in tort actions, requires that a plaintiff prove "[t]he actions or omissions of [the] defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate."  O.R.C. § 2315.21 (C)(1).  The *Stepic* Court defined malice as:

> Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Stepic*, 2000 Ohio App. LEXIS 5888 *28 (quotation omitted).

-48-

Defendant relies on the absence of any evidence in the record that it acted with malice and argues that Plaintiff cannot prove it acted with "malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate." O.R.C. § 2315.21 (C)(1). Defendant has met its burden under the summary judgment standard and is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as it relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *See Celotex Corp.*, 477 U.S. 317.

Plaintiff does not address Advance's Motion for Summary Judgment on her state law claims for punitive damages and attorney fees anywhere in her 71-page Opposition. (*See* Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 104.) Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Additionally, this court has no duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *J.C. Bradford & Co.*, 886 F.2d at 1479-80 (citing *Frito-Lay, Inc.*, 863 F.2d at 1034).

As Plaintiff has failed to argue or point to any evidence in the record showing that there is a genuine issue of material fact regarding whether Defendant acted with ill will or a spirit of revenge, or with a conscious disregard for Plaintiff's rights and safety that had a great probability of causing substantial harm, and Plaintiff bears the burden of proof on this point, this court grants Defendant's Motion for Summary Judgment on Plaintiff's claims for punitive damages and attorney's fees.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (ECF No. 76) is denied.  Defendant's Motion for Summary Judgment (ECF No. 87) is granted in part and denied in part as follows:

Defendant's Motion for Summary Judgment on Plaintiff's interference in violation of the Family and Medical Leave Act is denied.

Defendant's Motion for Summary Judgment on Plaintiff's claim for FMLA-related actual damages is denied.

Defendant's Motion for Summary Judgment on Plaintiff's claim for liquidated damages relating to her FMLA claim is denied.

Defendant's Motion for Summary Judgment on Plaintiff's hostile environment claim is denied.

Defendant's Motion for Summary Judgment on Plaintiff's *quid pro quo* claim is granted.

Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim is granted.

Defendant's Motion for Summary Judgment on Plaintiff's negligent supervision/negligent retention claim is denied.

Defendant's Motion for Summary Judgment on Plaintiff's discharge in violation of Ohio public policy is granted.

Finally, Defendant's Motion for Summary Judgment on Plaintiff's claim for an award of punitive damages and attorney's fees on her state law claims is granted.

IT IS SO ORDERED.

/s/*SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

January 10, 2007

-51-